CHARLES RICHARDSON & others *vs.* ISAAC RICH & others.

If common carriers by water, whose duty of transportation is fulfilled upon landing goods on a wharf in a city, cause them to be carried from the wharf to the place of business of the consignee in the city, they have no lien on them for such additional transportation, (whether or not it is performed by their own servants,) in the absence of any authority for it from either consignor or consignee; and the facts that they received the goods from the consignor marked with the place of business of the consignee, and gave no bill of lading or written receipt for them, do not import such an authority.

TORT for the conversion of six kegs of lead. Trial in the superior court, without a jury, before *Lord*, J., who found these facts :

" In May 1867, the plaintiffs were merchants, having a place of business at No. 61 Broad Street, Boston ; and the defendants were proprietors of a line of steamboats running from ports in Maine to Boston. The defendants owned no teams, but were in the habit of sending perishable articles and small packages, brought on their boats to Boston, to the place of business or residence of the consignee, when they had not previously received directions to the contrary, by a certain teamster, allowing him to add the amount of his charge for cartage to the freight bill and collect the entire sum from the consignee. This custom was not known to the plaintiffs, who owned teams for the carting of their goods. Before the transaction hereinafter stated, the parties had no dealings with each other. At the time above stated, the defendants received on one of their boats, at a port in Maine, for transmission to the plaintiffs, six kegs of ead, marked ' Charles Richardson & Co. 61 Broad St., Boston.'

No bill of lading or receipt was given. The lead was brought to a wharf in Boston, and there landed. Shortly after its arrival, the defendants' agent sent it, by the teamster above referred to, to the plaintiffs' place of business, giving the teamster for collection a bill against the plaintiffs for freight to Boston, one dollar, upon which the teamster wrote the additional charge for cartage, twenty-five cents. He carried the lead to the plaintiffs' place of business, and presented the bill for payment. The plaintiffs offered to pay the freight, but refused to pay the charge for cartage. The teamster accordingly declined to leave the lead, and carried it back to the defendants' agent, who placed it in their storehouse. The latter took back the bill from the teamster, erased the word 'cartage' on it, and inserted the word 'expense,' leaving the amount of the charge, twenty-five cents, as before. The plaintiffs, having been notified by their consignor, knew of the arrival of the goods, and, about two hours after the arrival of the steamer, sent their team to the wharf; but the goods had been sent out, as above stated, the teams passing each other. Subsequently, on the same day, one of the plaintiffs came with a team to the wharf, and demanded the lead, tendering payment of the one dollar for freight, but the defendants refused to deliver it unless both items on the bill were paid. The defendants admitted that they had not paid, and were not bound to pay, the teamster for the carting."

Upon these facts, the defendants requested the judge to rule that they had a lien upon the lead until the charges, both for freight and cartage, were paid; but the judge ruled otherwise, and gave judgment for the plaintiffs. The defendants alleged exceptions.

*R. M. Morse, Jr., & C. P. Greenough*, for the defendants.

*J. O. Teele*, for the plaintiffs.

AMES, J. The defendants, as common carriers by water, would presumptively be under no obligation to do anything more than to convey the goods to the wharf in Boston, and there to land them. In general, it would not be a part of their contract to carry them from the wharf to the consignees' usual place of business; and the fact that they were employed as

common carriers would not of itself indicate that they were expected or employed to do anything more than to land the goods safely, and at their usual landing place in Boston. The marks on the kegs, giving the street and number of the plaintiffs' place of business, would apprise the defendants whom they were to notify, but would not modify or enlarge their contract. When the goods were properly and safely landed, therefore, the defendants had done all that they were bound as common carriers, or had been employed, to do. If they undertook afterwards to do anything more, it was entirely outside of anything expressed or implied in their contract. It is true that the report finds that it was their habit to send goods from their landing place to the warehouses of their respective consignees, but nothing appears to show that it was an established and well known usage of the business, and it is expressly alleged that the plaintiffs had no knowledge of any such practice.

The question then is, simply, whether the carrier, by his own act, and without any authority, express or implied, from consignor or consignee, can impose upon the latter the further and additional obligation of paying the carrier himself, or some new intermediate carrier selected by him, for the transportation of the goods from the wharf to the consignees' place of business. Probably in the great majority of instances such an arrangement might be convenient to all parties concerned, and in such cases no question would be raised. But it is not difficult to suppose cases in which it might happen that the consignee would greatly prefer to have the goods conveyed, not to his usual place of business, but to some entirely different place, where he might be bound by contract, or for any other reason might prefer, to have them sent. Or he may be provided with wagons, horses and men of his own; and for that reason may prefer to convey the goods himself, by his own servants or agents. At all events, he has the right to judge for himself in what manner and to what place he will remove the goods, after the carrier has brought them to the end of the line over which he undertook to transport them.

The defendants, then, appear to be in the position of carriers, who, having no legal claim on the goods for anything besides the freight, (that is to say, the freight from the port in Maine to Boston,) refuse to deliver them unless a further sum, which they have no right to charge, be first paid. Such a refusal is evidence of a conversion. *Adams* v. *Clark*, 9 Cush. 215.

*Exceptions overruled.*